# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

SARA HILLINS,

       Plaintiff,

v.                                    **MEMORANDUM OF LAW & ORDER**
                                Civil File No. 10-2845 (MJD/LIB)

MARKETING ARCHITECTS, INC.,

       Defendant.

Bonnie M. Smith, James H. Kaster, and Megan I. Brennan, Nichols Kaster, PLLP, Counsel for Plaintiff.

Dawn C. Van Tassel, Howard B. Tarkow, and Nadege J. Souvenir, Maslon Edelman Borman & Brand, LLP, Counsel for Defendant.

## I.      INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary Judgment [Docket No. 11].  The Court heard oral argument on July 29, 2011.  For the reasons that follow, the Court denies the motion for summary judgment.

## II.   BACKGROUND

### A.   Factual Background

#### 1.   The Parties

Defendant Marketing Architects, Inc. ("MAI") is a Minnesota company

that assists radio and television advertisers in their direct-marketing advertising

initiatives.

Plaintiff Sara Hillins has a BA in marketing and an MBA.  She was hired by

MAI in October 2005 as an Account Manager in Advertiser Services.  Her

primary responsibility was to manage advertiser client relationships.

In September 2006, Hillins was promoted to Manager and began to

manage direct reports.  In June 2007, she became the Account Director of

Advertiser Services and managed a team of Account Managers and Account

Associates.  By February 2008, she managed the most account relationships of

any employee at MAI.

In late 2008 and early 2009, MAI reconfigured Advertiser Services so that

accounts would be allocated to employees by industry group, with the goal that

each employee would become a subject-matter expert with respect to her

particular industry.  In January 2009, Hillins became Practice Lead of Beauty and Cosmetics.

In January 2009, Thomas Shipley, the President of Atlantic Coast, learned that his account team at MAI was changing to be under Hillins' direction.  He "hates surprises" and was apprehensive about the change.  (Longval Dep. 27-29.)

Atlantic Coast was MAI's largest client and made up most of Hillins' Beauty and Cosmetics group.  Defendant claims that, in February or March 2009, Shipley called MAI President Brent Longval and expressed concern that Hillins was not bringing value to the account.  Defendant further claims that, in May 2009, Shipley again contacted Longval and also MAI Vice President Meg Borman, and requested that Hillins be removed from its account.  But MAI did not inform Hillins about Shipley's complaints.

In February 2009, Hillins also took over the Home Goods and Services practice after a colleague departed and left those duties, and one of the main accounts in that practice, Lumber Liquidators, requested Hillins back on its account.  Hillins was the only Director-level employee who was also a Practice Lead.  The three other women who headed up the industry groups held the title of Vice President.

In May 2009, MAI CEO, Charles Hengel, who was also Hillins supervisor, told Hillins that he would be nominating her for Vice President.

### 2.   Hillins' Pregnancy

On Friday, June 5, 2009, Hillins told Hengel that she was pregnant.  Hillins made arrangements with Hengel and Talent Services (MAI's human resources department) to take 12 weeks maternity leave and an additional two weeks and two days of vacation.

One or two business days after Hillins disclosed her pregnancy, MAI suddenly informed Hillins that Shipley had requested that he have his account team back, so she would no longer be on the Atlantic Coast account.  Also, Hillins would no longer be the Practice Lead of Beauty and Cosmetics because the Atlantic Coast account made up almost the entire Beauty and Cosmetics portfolio.  The Atlantic Coast account was transitioned to Borman.

The same week, Hengel offered Hillins the choice to work directly with him in a new department, Revenue Management, or to remain as the Practice Lead for the Home Goods and Services team.  Hillins asserts that Hengel and others at MAI steered her to take the Revenue Management position.  Hillins

decided to accept the Revenue Management job, which was a lateral move and did not affect Hillins' compensation or benefits.

Hillins testified that, after she announced her pregnancy to Hengel, he stopped talking about nominating her for Vice President and, in fact, she was never nominated for Vice President.

Throughout June 2009, she transitioned most of her account responsibilities to other MAI employees and began to work with Hengel to define the newly created Revenue Management department.  At that time, she had no direct reports.  MAI did recruit for an employee to report to Hillins in that department, but the posting was removed because MAI claimed that it wanted to wait until Hillins was back from leave to fill that role.

Hillins claims that, once she accepted the new position, Hengel stopped communicating with her.  MAI isolated her and stopped providing information to her that she needed to do her job, while continuing to provide that information to other employees.

In August 2009, the Revenue Management Department was renamed Marketing Insights, and Hillins began to report to Chief Marketing Officer, Jeffrey Clement.  Hillins' duties included gathering information from other areas

of the company, analyzing the data, and communicating best practices across

company departments, and, eventually, to clients.  Clement opined that Hillins'

role in Marketing Insights would eventually require regular communication with

advertisers.

In the months leading up to Hillins' maternity leave, Clement told Hillins

to make arrangements to transfer her responsibilities to Jonathan McClellan and

Travis Boisvert, MAI employees in the Loyalty Solutions department.  In mid-

November, Hillins met with Clement to discuss plans for the Marketing Insights

department while she was on maternity leave.  Clement stated that McClellan

and Clement "were working on some loyalty solutions initiatives and he didn't

know what [her] position would look like when [she] came back," and Hillins

inferred that Boisvert and McClellan might be taking over her position

permanently.  (Hillins Dep. 76.)  Hillins expressed concern regarding whether

she would have a job when she returned from leave.  Clement told her that she

did not need to worry about that and that she would have a job when she

returned, but he "just d[id]n't know what it will look like" or to whom she

would report.  (Id. 9.)  Hillins reiterated to him that she was coming back to work

and Clement replied that "a lot of women say that they're going to come back

and they don't so we need to proceed like you're not coming back."  (Id. 9-10.)

She stated that she was a "career person, [] received [her] MBA for a reason,

[and] [] wasn't going to be a stay-at-home mom," and Clements replied that "he

wished that [she would] just spend time at home with [her] son when he was

born."  (Id. 10.)   He thought that she "should focus on" "spending time with

[her] son."  (Id. 11.)

Up until her leave, MAI had provided positive feedback for Hillins'

position in Marketing Insights.  In Clement's 2009 Accomplishments, he stated

that Marketing Insights "created a success story for Sara."  The "business was

recognizing Sara's role" and there was "good feedback" about it.  (Clement Dep.

105-06.)  Other MAI employees also expressed positive reactions.

### 3.      Events During Hillins' Maternity Leave

Hillins began her maternity leave on November 25, 2009, when her son

was born.  She used a combination of accrued paid time off, short-term disability

benefits, and unpaid FMLA leave.

While Hillins was on leave, Clement considered merging Marketing

Insights with Loyalty Solutions, another department that reported to him.

McClellan worked on a proposal for a merged business unit, which McClellan

would head, and in which Hillins would work when she returned from leave.

Clement told McClellan that MAI had to plan for all contingencies, including

Hillins not returning from leave, so McClellan placed an asterisk by her name on

the planning documents to reflect this uncertainty.  McClellan removed the

asterisk in mid-January 2010 because there was no indication that Hillins would

not be returning to work.  Clement asked McClellan to draft the organization

chart that included McClellan as the lead, with Hillins reporting to him.

McClellan had fewer degrees and less seniority at MAI than Hillins.  Until 2009,

he had no management experience at MAI.

On December 11, 2009, Hillins attended the MAI holiday party.  Clement

gave her a bonus check and congratulated her for doing such a good job that

year.

In late January 2010, MAI's executive management team met at a regularly

scheduled board meeting.  The management team conducted a four-day summit

to re-examine the business and find ways to meet MAI's goals for the year.  The

team discussed MAI's financial performance, examined each business unit, and

then decided to make changes to the business due to MAI's financial

performance.  However, there is no documentation to support participants'

testimony regarding the content and purpose of the summit.  MAI asserts that its

goal was to remain profitable for 2010.

As a result of the summit, MAI eliminated two business units – Marketing

Insights (which consisted solely of Hillins) and Yield Advantage – Television.

Hillins was terminated, and two of the employees in Yield Advantage –

Television were reassigned, while two others were terminated.  Two other

employees – one from Technology and one from Affiliate Services – were also

terminated for performance reasons.

The executive management team claims that they engaged in a cursory

discussion of whether Hillins was qualified to assume another existing role at

MAI, but decided that she could not transition back to account responsibilities.

They assert that they concluded that she was unfit for an account management

role because she had been removed from MAI's largest account at the client's

request.  MAI also argues that another large Hillins account, Lumber

Liquidators, abruptly fired MAI; however, the evidence in the record is that

Lumber Liquidators ended its relationship with MAI <u>after</u> MAI removed Hillins

from its account.  The Lumber Liquidators client contact has submitted an

affidavit praising Hillins' client service and averring that it did not leave MAI because of Hillins.

As a result of the January summit, MAI laid off five employees.  Hillins was the only laid-off employee who was on parenting leave at the time she was terminated.  No one assumed the duties that Hillins had been performing in Marketing Insights.  The Marketing Insights department was eliminated and that role no longer exists at MAI.

On January 29, 2010, Hillins visited MAI to show her colleagues her new baby and to remind them that she would soon be returning to work.  Clement spoke briefly with her.

On February 1, 2010, Clement and Scott Patten, Vice President of Talent Development, informed Hillins of her termination over the telephone.

At the time of Hillins' termination, MAI was advertising for 12 job openings.  A number of the posted positions fit Hillins' qualifications, such as Business Analyst, Account Manager (a position from which she had been promoted), and Account Director (her former position).  MAI's expert testified that Hillins appeared qualified for the MAI Business Analyst posting.

MAI sought to hire for more than 50 separate job openings between

January 1, 2010, and January 1, 2011.  During that year, MAI hired more than a

dozen new employees.

## B.    Procedural History

In March 2010, Hillins filed a discrimination charge with the EEOC against

MAI.  On July 2, 2010, Hillins filed a Complaint against MAI in this Court

alleging: Count One: Violation of the Family Medical Leave Act ("FMLA");

Count Two: Violation of the Minnesota Parenting Leave Act ("MPLA"); Count

Three: Violation of Title VII of the Civil Rights Act of 1964, as Amended (Sex

Discrimination); and Count Four: Violation of the Minnesota Human Rights Act

("MHRA") (Sex Discrimination).  MAI now moves for summary judgment on all

claims against it.

## III.   DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case."  Amini v. City of

Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

### B.    FMLA

The FMLA provides eligible employees up to 12 weeks of unpaid leave

during any 12-month period to, among other things, care for a new baby.  29

U.S.C. § 2612(a)(1).

> Two types of claims exist under the FMLA: (1) 'interference' or '(a)
> (1)' claims in which the employee alleges that an employer denied or
> interfered with his substantive rights under the FMLA and (2)
> 'retaliation' or '(a)(2)' claims in which the employee alleges that the
> employer discriminated against him for exercising his FMLA rights.

Stallings v. Hussmann Corp., 447 F.3d 1041, 1050 (8th Cir. 2006) (citing 29 U.S.C.

§ 2615(a)(1)-(2)).  "The difference between the two claims is that the interference

claim merely requires proof that the employer denied the employee his

entitlements under the FMLA, while the retaliation claim requires proof of

retaliatory intent."  Id. at 1051 (citation omitted).  "Although in some

circumstances, a given set of facts will fall clearly into either (a)(1) or (a)(2), it

appears that the lines between the two categories are not hard and fast." Id.

(citation omitted).

Hillins asserts that her FMLA claim survives under both theories.

**C.     FMLA Retaliation**

**1.     FMLA Retaliation Standard**

The FMLA prohibits employers from discriminating against
an employee for asserting his rights under the Act.  This prohibition
necessarily includes consideration of an employee's use of FMLA
leave as a negative factor in an employment action.  Basing an
adverse employment action on an employee's use of leave . . . is
therefore actionable.

Stallings, 447 F.3d at 1051 (citations omitted).

An employee can prove Leave Act retaliation circumstantially, using
a variant of the McDonnell Douglas method of proof.  To establish a
prima facie case of retaliation, [Hillins] must show that she exercised
rights afforded by the Act, that she suffered an adverse employment
action, and that there was a causal connection between her exercise
of rights and the adverse employment action.

Smith v. Allen Health Sys., Inc., 302 F.3d 827, 832 (8th Cir. 2002) (citation and

footnote omitted).  "If the employer comes forward with evidence of a legitimate,

nondiscriminatory reason for its treatment of the employee, the employee must

then point to some evidence that the employer's proffered reason is pretextual." Id. at 833 (citation omitted).

Hillins asserts that she exercised her FMLA rights by taking leave, and MAI retaliated against her by terminating her employment.  She argues that her claim survives under either the McDonnell Douglas test or under a showing of direct evidence.

## 2.     Direct Evidence

"[D]irect evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action."  Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004) (citation omitted).  Direct evidence is evidence "of conduct or statements by persons involved in the decision-making process, which indicate a discriminatory attitude was more likely than not a motivating factor in the employer's decision."  Kratzer v. Rockwell Collins, Inc., 398 F.3d 1040, 1046 (8th Cir. 2005).

The Court concludes that Hillins has failed to point the Court to direct evidence of discrimination.  Hillins highlights Clement's comments.  However,

his comments to Hillins regarding the fact that her position might be different

when she returned from leave and that many women do not return from

maternity leave are not the type of facially discriminatory comments that can be

characterized as direct evidence.  Nor does the fact that MAI planned for the

contingency that she might not return from leave constitute direct evidence of

discrimination.  The Court now turns to the <u>McDonnell Douglas</u> analysis of

Hillins' FMLA retaliation claim.

### 3.   <u>McDonnell Douglas</u> Test

#### a)   Prima Facie Case

For the purposes of its summary judgment motion, MAI concedes that

Hillins has satisfied the prima facie case.  It admits that she has shown causation

through the use of temporal proximity – she was terminated while she was on

FMLA leave.

#### b)   Whether MAI Has Articulated a Legitimate, Non-Discriminatory Reason for Termination

MAI has articulated a legitimate, non-discriminatory reason for the

termination of Hillins' position: she was downsized as part of a reduction in

force ("RIF") that eliminated her business unit.  "[T]he FMLA is not a strict-

liability statute.  An employee who requests FMLA leave has no greater

15

protection against termination for reasons unrelated to the FMLA than she did before taking the leave." Estrada v. Cypress Semiconductor (Minn.) Inc., 616 F.3d 866, 871 (8th Cir. 2010) (citations omitted).

### c)    Pretext Standard

> There are at least two ways a plaintiff may demonstrate a material question of fact regarding pretext.  A plaintiff may show that the employer's explanation is unworthy of credence . . . because it has no basis in fact.  Alternatively, a plaintiff may show pretext by persuading the court that a [prohibited] reason more likely motivated the employer.  Either route amounts to showing that a prohibited reason, rather than the employer's stated reason, actually motivated the employer's action.

Torgerson v. City of Rochester, 643 F.3d 1031,  (8th Cir. 2011) (en banc) (citations omitted).  If an employer shows that the employee was terminated based on a bona fide RIF, "the employee then must show that the nondiscriminatory reason is a pretext for discrimination, and . . . that the protected criteria . . . was a factor in the adverse employment decision."  Groves v. Cost Planning & Mgmt. Int'l, Inc., 372 F.3d 1008, 1009 (8th Cir. 2004) (citation omitted).  This higher standard does not apply if the employer fails to establish that the plaintiff was "terminated pursuant to a legitimate reduction-in-force."  Rademaker v. State of Neb., 906 F.2d 1309, 1312 (8th Cir. 1990).

### d)      Whether MAI Implemented a Bona Fide RIF

MAI argues that it carried out a bona fide RIF.  A RIF "occurs when business considerations cause an employer to eliminate one or more positions within the company," and the employer "eliminate[s] or redistribute[s] all [of the employee's] duties." Ramlet v. E.F. Johnson Co., 507 F.3d 1149, 1154 (8th Cir. 2007); Brocklehurst v. PPG Indus., Inc., 123 F.3d 890, 895 (6th Cir. 1997) (citation omitted).  On the other hand, "[w]hen a company fires one worker and replaces him with another, there is no net loss in the number of employees and no 'reduction in force' as the term is commonly understood." Sanders v. Kohler Co., 641 F.3d 290, 294 (8th Cir. 2011) (explaining that this definition is "consistent with how [the Eighth Circuit] ha[s] construed 'reduction in our force' in [] employment discrimination cases").

MAI asserts that Hillins was terminated as part of a RIF that included four other employees, none of whom had recently exercised their FMLA rights while employed at MAI.  Hillins' duties have not been redistributed to any other MAI employee, and no employee has been hired or reassigned to perform her job functions.

"RIF plans generally include objective criteria by which to determine which jobs will be eliminated and often include objective evidence of a business

decline." Gaworski v. ITT Commercial Fin. Corp., 17 F.3d 1104, 1109 (8th Cir.

1994) (citation omitted).  However, "[w]hen a company exercises its business

judgment in deciding to reduce its work force, it need not provide evidence of

financial distress to make it a 'legitimate' RIF."  Rahlf v. Mo-Tech Corp., Inc., 642

F.3d 633, 639 (8th Cir. 2011) (citation omitted).

No objective evidence of a decline in business has been presented to the

Court.  "Although not dispositive[,] a lack of objective evidence of a business

decline can give rise to a fact question regarding the genuineness of a RIF."

Stenberg v. I.C. Sys., Inc., Civil No. 07-4064 ADM/JJK, 2009 WL 1507417, at *8 (D.

Minn. May 29, 2009) (footnote and citations omitted).

Nor has MAI pointed to evidence of objective criteria by which it

determined which jobs would be eliminated.  MAI has produced no documents

pertaining to the RIF to explain MAI's decision-making process.  The testimony

regarding why Hillins' position was chosen is vague.  Viewing the evidence in

Hillins' favor, MAI did not apply any objective or uniform criteria when it

conducted the alleged RIF.  Five employees were terminated from four different

business units, and two of those were fired for performance reasons.  Two other

employees were simply transferred to different units.  MAI admits that

reshuffling business units is a common practice at MAI.

Moreover, at the time MAI terminated Hillins, it had 12 job openings.

MAI posted more than 50 jobs between January 1, 2010, and January 1, 2011, and

hired more than a dozen new employees during that time.

This case is not like <u>Leal v. BFT, Ltd. Partnership</u>, relied upon by MAI.  No.

10–20411, 2011 WL 1659573 (5th Cir. Apr. 28, 2011) (unpublished).  In <u>Leal</u>, the

employer laid off ten employees in a RIF, including the plaintiff, who was out on

maternity leave.  In that case, there was undisputed evidence that the employer

considered eliminating the plaintiff's job before she exercised her FMLA rights.

<u>Id.</u> at *4.  In this case, MAI was discussing nominating Hillins for Vice President

before she announced her pregnancy and intent to take FMLA leave, and,

immediately after Hillins announced her pregnancy and intent to take FMLA

leave, she was removed from consideration to be Vice President, an entire

practice area was removed from her management, and she was moved to a new

position that, in January, MAI classified as unnecessary and cut.

Hillins has raised a genuine issue of material fact as to the genuineness of

the RIF.  The Court concludes that MAI has failed to establish that Hillins was

terminated pursuant to a legitimate RIF; therefore, the higher RIF pretext

standard does not apply.

### e)    Evidence of Pretext

The Court concludes that Hillins has raised a genuine issue of material fact

regarding pretext.

While timing alone is usually insufficient to create a triable case, there are

multiple timing issues in this case, along with other evidence of pretext.  First,

although MAI claims that Atlantic Coast had been complaining about Hillins'

performance for months, MAI management never passed that feedback onto

Hillins, and, instead, withheld this alleged criticism from its main client.  Then,

within a business day or two after Hillins announced her pregnancy and FMLA

leave, Hengel abruptly informed her that he was removing her from the Atlantic

Coast account and, therefore, was removing her as Practice Lead of Beauty &

Cosmetics.

Second, although in May 2009, Hengel told Hillins that she would be up

for Vice President, that idea was dropped after Hillins announced her pregnancy

in June 2009.  Additionally, Hengel stopped communicating with Hillins and,

generally, MAI began to withhold information from her.

Third, Hillins was terminated from her new position while on maternity leave.

This timing evidence is combined with other evidence of pretext.  For example, there is evidence that MAI management planned that Hillins would not return – as shown in Clement's comments and the organization chart with an asterisk by Hillins' name.  There is evidence that MAI made no effort to place Hillins in another open position, although there were twelve at the time she was laid off, including positions from which Hillins had been promoted and for which MAI's own expert opined Hillins was qualified.  MAI advertised more than 50 job openings in 2010 and hired more than a dozen new employees.

Additionally, viewing the evidence in the light most favorable to Hillins, Clement's comment that she ought to focus on spending time with her son could be interpreted to be an indication that he did not want her to return from maternity leave.

Furthermore, there is evidence in the record that makes MAI's articulated explanation for terminating Hillins and failing to move her to another position suspect.  MAI claims that that Atlantic Coast, an important client, was complaining about Hillins' performance beginning in February or March 2009

and again in May 2009.  However, in May 2009, MAI management was telling

Hillins that she would be nominated for Vice President, indicating that MAI was

pleased with her performance.  Additionally, after the fact, MAI claims that the

loss of the Lumber Liquidators account made Hillins unfit for transfer to a client-

centered position, but that account was lost <u>after</u> Hillins was removed as the

manager.  Also, Hillins received positive feedback on her work from her

supervisor and colleagues immediately preceding her maternity leave.  <u>See</u>

<u>Stallings</u>, 447 F.3d at 1052 (noting that employee can show pretext through

evidence "that the employee received a favorable review shortly before he was

terminated" or "that the employer changed its explanation for why it fired the

employee") (citation omitted).  MAI's explanation that Hillins could not perform

an account management role is contradicted by other evidence in the record:

Hillins had been promoted three times while working in account management,

and Hengel had stated that her Marketing Insights position would evolve into a

department that would regularly communicate with clients, indicating his

opinion that Hillins was qualified to work in account management.  MAI's own

expert admits that Hillins was qualified for the open Business Analyst position.

Finally, although MAI argues that only the Marketing Insights/Revenue Management position – the position Hillins held when her leave commenced – is a comparable position for FMLA purposes, viewing the evidence in Hillins' favor, she was in an account management position – as head of two product units – at the time she announced her pregnancy and her move to Revenue Management and then Marketing Insights was part of MAI's discriminatory retaliation.  Under this interpretation of the facts, it is the Practice Lead position that is comparable position.

### D.     FMLA Interference

Hillins argues, in the alternative, that her FMLA claim can be analyzed as an interference claim.

> An employer is prohibited from interfering with, restraining, or denying an employee's exercise of or attempted exercise[] of any right contained in the FMLA.  Interference includes not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.  It would also include manipulation by a covered employer to avoid responsibilities under FMLA.  An employer's action that deters an employee from participating in protected activities constitutes an "interference" or "restraint" of the employee's exercise of his rights.

Stallings, 447 F.3d at 1050 (citations omitted).  Additionally,

> every discharge of an employee while she is taking FMLA leave interferes with an employee's FMLA rights.  The employer is not

> liable for this interference, however, where an employee's reason for
> dismissal is insufficiently related to FMLA leave . . . . The burden is
> on the employer to prove the reason for termination was unrelated
> to FMLA.

Phillips v. Mathews, 547 F.3d 905, 911 (8th Cir. 2008) (citations omitted).

The Court has already concluded that Hillins' FMLA claim survives under a retaliation analysis.  Although the line between retaliation and interference claims is grey, the Court concludes that Hillins' FMLA claim also survives under an interference theory.  MAI terminated Hillins while she was on FMLA leave. Therefore, it interfered with her FMLA rights.  See Phillips, 547 F.3d at 911.  For the reasons the Court has explained with regard to the FMLA retaliation claim, the Court concludes that Hillins has raised a genuine question of material fact regarding whether MAI's reason for terminating her was unrelated to the FMLA.

### E.     Title VII and MHRA Sex Discrimination

Hillins has asserted sex discrimination claims under both Title VII and the MHRA.  Both statutes prohibit an employer from discriminating against an employee because of her sex.  See 42 U.S.C. § 2000e-2; Minn. Stat. § 363A.08.  The Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k) provides that discrimination based on "pregnancy, childbirth, or related medical conditions" constitutes sex discrimination for the purposes of Title VII.  The MHRA defines "sex" to include

"pregnancy, childbirth, and disabilities related to pregnancy or childbirth."

Minn. Stat. § 363A.03, subd. 42.

Pregnancy-related sex discrimination under both Title VII and the MHRA

may be shown through the McDonnell Douglas test.  See Fjelsta v. Zogg

Dermatology, PLC, 488 F.3d 804, 809-10 (8th Cir. 2007).

> Under McDonnell Douglas, [Hillins] must first establish a prima
> facie case of discrimination: 1) she is a member of a protected group;
> 2) she was qualified for her position; 3) she suffered an adverse
> employment action; and 4) she was discharged under circumstances
> giving rise to an inference of discrimination.

Wierman v. Casey's General Stores, 638 F.3d 984, 993 (8th Cir. 2011) (citation

omitted).  If Hillins meets her burden, the burden of production shifts to MAI "to

articulate a non-discriminatory, legitimate justification for its conduct, which

rebuts the employee's prima facie case."  Id. (citation omitted).  If MAI meets its

burden, Hillins "must then produce evidence sufficient to create a genuine issue

of material fact showing that [MAI]'s explanation is merely a pretext for

unlawful discrimination.  [T]he issue is whether the plaintiff has sufficient

evidence that unlawful discrimination was a motivating factor in the defendant's

adverse employment action."  Id. (citations omitted).

MAI concedes Hillins' prima facie case, except the causal connection.  The Court concludes that Hillins has presented sufficient evidence to support a causal connection in the form of Clement's comments, temporal proximity, and other evidence of pretext, as explained with regard to the FMLA retaliation pretext discussion.  Although the FMLA claim is based on MAI's response to Hillins' decision to take FMLA leave and the Title VII and MHRA claims are based on Hillins' pregnancy, Hillins announced her pregnancy and intent to take leave at the same time and the two are intertwined, so the analysis of the claims is substantially the same.  Similarly, the Court concludes that Hillins has raised a genuine issue of material fact regarding pretext for the same reasons as explained with regard to her FMLA claim.

### F.   MPLA

Both parties apply the same <u>McDonnell Douglas</u> standard that applies to FMLA claim to Hillins' MPLA claim.  The Court concludes that Hillins' MPLA claim withstands summary judgment for the same reasons as her FMLA claim survives

The Court rejects MAI's assertion that Minn. Stat. § 181.942, subd. 1(b), requires summary judgment for MAI.  The layoff language in the statute, does

permit the employer to lay off an employee on leave if the employee would have been laid off if she had not been on leave.  However, the material questions under the statute are the same as under the FMLA analysis: was the MAI RIF "bona fide" and was Hillins chosen for termination based on her exercise of her right to parental leave?  See Minn. Stat. § 181.942, subd. 1(b) ("If, during a leave . . . , the employer experiences a layoff and the employee would have lost a position had the employee not been on leave, pursuant to the good faith operation of a bona fide layoff and recall system, . . . the employee is not entitled to reinstatement in the former or comparable position.").  As the Court explained with regard to the FMLA claim, there are genuine issues of material fact regarding whether Hillins was terminated pursuant to a bona fide RIF and whether MAI chose to terminate Hillins because of her exercise of her leave rights.

The Court further rejects MAI's argument that it complied with MPLA by allowing Hillins to complete six weeks of unpaid leave, see Minn. Stat. §181.941, subd. 1.  While Hillins has not demonstrated a claim for MPLA interference, she has asserted a viable claim for MPLA retaliation, based upon her termination in retaliation for taking MPLA leave.

Accordingly, based upon the files, records, and proceedings herein**, IT IS**

**HEREBY ORDERED**:

Defendant's Motion for Summary Judgment [Docket No. 11] is **DENIED**.


Dated:   September 5, 2011          s/ Michael J. Davis
                                     Michael J. Davis
                                     Chief Judge
                                     United States District Court